UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------X
NIC BEZUSZKA, a/k/a NIC MARYLIW;
GILBERT KUNCL, individually and
as legal guardian of JESSICA KUNCL;
JESSICA KUNCL; TROI SULIMAN,
individually and as legal guardian
of ASHLEY SULIMAN; ASHLEY SULIMAN;
LINDA WILLIAMS, individually, and          **MEMORANDUM AND ORDER**
as legal guardian of CAITLIN
WILLIAMS; CAITLIN WILLIAMS; MICHELE         04 Civ. 7703 (NRB)
MILLER; JOHN DOES 1-5; and
JANE DOES 1-5,

               Plaintiffs,

       - against -

L.A. MODELS, INC.; NYC MANAGEMENT
GROUP, INC., d/b/a NEW YORK MODEL
MANAGEMENT; HEINZ HOLBA,
individually
and in his official capacity;
SCHWARZKOPF & DEP, INC.,

               Defendants.
-------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


On September 29, 2004, plaintiffs Nic Bezuszka

("Bezuszka"), Gilbert Kuncl, Jessica Kuncl ("Kuncl"), as well as

John and Jane Does, filed a complaint against defendants L.A.

Models, Inc. ("L.A. Models"), NYC Management Group, Inc., d/b/a

New York Model Management ("N.Y. Models") (sometimes referred to

together as the "L.A. Models Defendants"), Heinz Holba,

individually and in his official capacity as an officer of both

L.A. Models and N.Y. Models, and Schwarzkopf & Dep, Inc.

("Schwarzkopf")[1] (collectively, "defendants"), alleging several claims arising out of the 2001 L.A. Looks Model Search Contest (the "2001 Contest"). On November 22, 2004, an amended complaint (the "Complaint") was filed, adding three new plaintiffs: Michele Miller ("Miller"), Linda Williams, and Caitlin Williams. Linda Williams is the mother of Caitlin Williams, the runner-up of the 2002 L.A. Look Model Search (the "2002 Contest"); on November 3, 2005, Linda and Caitlin Williams voluntarily dismissed their claims against the defendants with prejudice. Plaintiffs Bezuszka, Kuncl, and Suliman (the "Model Plaintiffs")[2] all competed in the 2001 Contest. Gilbert Kuncl is the father of Kuncl, and Troi Suliman is the mother of Suliman. Both Kuncl and Suliman were minors throughout the period at issue in this case. Plaintiff Miller is the agent of Jessica Stam, the winner of the 2002 Contest. The L.A. Models Defendants sponsored both the 2001 and 2002 Contests. Schwarzkopf, the manufacturer of L.A. Looks hair care products, was a sponsor of the 2001 Contest. Schwarzkopf is not alleged to have had any involvement with the 2002 Contest.

---

[1]     The Henkel Corporation is Schwarzkopf's successor-in-interest. However, the complaint did not name the Henkel Corporation as a defendant. Thus, we refer throughout the opinion to "Schwarzkopf" to reflect the nomenclature used in the Complaint.

[2]     When referring to the Model Plaintiffs, we also intend to refer to Gilbert Kuncl and Troi Suliman, the parents of the minor models.

The plaintiffs allege thirteen causes of action, which are of six varieties: (1) breach of contract; (2) fraud and intentional misrepresentation; (3) violations of New York and California state statutes prohibiting deceptive business practices; (4) unjust enrichment; (5) tortious interference with prospective business relations; and (6) accounting and constructive trust. In addition to money damages, the Model Plaintiffs seek declaratory relief. Defendants move to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons discussed below, this motion is granted in part and denied in part.

## FACTS[3]

### A. Overview

The "L.A. Looks Model Search Contest" (the "Contest") is an annual modeling contest created and sponsored by defendants.[4] The Contest is named after "L.A. Looks" hair care products, manufactured by defendant Schwarzkopf, the Contest's primary creator. Schwarzkopf, however, ceased its sponsorship after the 2001 Contest. Consequently, the L.A. Models Defendants, the remaining co-sponsors of the Contest, renamed it the "L.A. Look Model Search Contest," without an "s" at the end of "Look," and

---

[3]    All facts are taken from the Complaint and are considered true for purposes of this motion.

[4]    At various points throughout the complaint, allegations are made that refer generally to "defendants" without specifying which defendants the term is meant to describe.

recruited additional sponsors, including Web Style Network, a Florida company. Defendant Holba is the President, CEO, and/or Founder of L.A. Models and N.Y. Models and served as a judge for the 2001 and 2002 Contests.

**1. The 2001 Contest**

Shortly before the 2001 Contest, defendants issued a press release describing the prizes at stake:

> The grand prize winner's modeling career will be launched with a $100,000/2-year modeling contract with L.A. Models. The first runner-up receives a $50,000/2-year modeling contract with L.A. Models, two second runners-up receive a $30,000/2-year modeling contract with L.A. Models and two third runners-up receive a $20,000/2-year modeling contract with L.A. Models.

Compl. ¶ 39. In addition to offering prize money, the Contest sponsors promised the winners secondary prizes, including a walk-on role on the NBC television show "Just Shoot Me" and appearances in print advertisements for L.A. Looks. As the primary promotional partner in the 2001 and 2002 Contests, L.A. Models agreed to provide both the grand prize and runner-up modeling contracts. N.Y. Models, a "sister agency" of L.A. Models, acted as the primary modeling agency for the Model Plaintiffs.

Tens of thousands of contestants entered the annual Contests by appearing at regional events. Prior to the final

competition, the sponsors selected twelve finalists. One week before the final competition in the 2001 Contest, which took place on June 12, 2001 in Los Angeles, Schwarzkopf sent each of the finalists a letter stating, "[s]ubject to your execution of the enclosed agreements, you have been selected as one of the finalists in the L.A. LOOKS Model Search final competition for 2001." Compl. Ex. E. Enclosed with Kuncl's and Bezuszka's letters, but not Suliman's, were two six-page, single-spaced agreements entitled "L.A. Models Agreement," with attached payment schedules "A" through "D" stating the winners' "Guaranteed Minimum Gross Income," and "The L.A. Looks Model Search – 2001 Contestant's Agreement" ("Contestant's Agreement").[5] In 2002, the event sponsors, which no longer included Schwarzkopf, sent finalists a packet a week before the competition containing an eight page, single-spaced agreement with schedules attached (the "2002 Agreement").

The Model Plaintiffs allege that the standardized agreements sent to the finalists a week before the 2001 Contest, served as their first notice of "numerous hidden strings and preconditions attached to the prize money." Compl. ¶ 55

---

[5] As discussed below, Suliman did not receive or sign any agreement until after the 2001 Contest.

(emphasis deleted).[6]  More specifically, the Model Plaintiffs allege that the agreements were unfair or unconscionable in several ways: (1) characterizing the money paid to winners as a "guarantee of gross income" rather than "prize money" in both the L.A. Models Agreement and the Contestant's Agreement; (2) offsetting this income by certain deductions, fees, and commissions in the L.A. Models Agreements; (3) requiring the models, rather than the agencies, to assume the risk of collection if clients failed to pay for modeling services; (4) naming L.A. Models and N.Y Models the exclusive representatives of the Model Plaintiffs; (5) requiring that the models be made available for work whenever their services were requested; and (6) requiring the models to maintain their appearance throughout the contract period.

The L.A. Models Agreement also contained a section entitled "Availability of Contestant," which provides:

> In the event that you are unavailable for potential modeling assignments more than four times (each request being made more than a week apart) during any twelve-month period during the twenty-four month term of this Agreement for personal reasons . . . , then L.A. MODELS shall have the option in its sole discretion to terminate this Agreement and the guarantee hereunder with no further cost or obligation to L.A. MODELS.

---

[6]    Plaintiff Miller alleges that the 2002 Agreement sent to her client, Jessica Stam, contained similar clauses.  Miller's allegations are discussed more in-depth below.

Compl. Ex. F at ¶ 4.  All of the Model Plaintiffs, as well as the minor plaintiffs' parents, signed both the L.A. Models Agreement and the Contestant's Agreement.  The Model Plaintiffs all allege that they fulfilled the availability requirements and otherwise complied with the terms of the agreements throughout their duration.

In the 2001 Contest, plaintiffs Kuncl, Bezuszka and Suliman won the Grand, First Runner-Up and Second Runner-Up Prizes, respectively.  The Model Plaintiffs allege that, based on the guarantee of income in the L.A. Models Agreement and other promises made by defendants, they forewent educational opportunities as well as potential employment with other modeling agencies.  They further allege that, despite their sacrifices and compliance with the defendants' conditions, the defendants "failed and/or refused to honor" their promises "without any cause or justifiable reason . . . and have not paid plaintiffs any of the contest prize money, despite due demand." Compl. ¶ 79.  Moreover, the Model Plaintiffs allege that "the L.A. Models Defendants have in fact[] actually demanded that some plaintiffs pay them money."  Compl. ¶ 80 (emphasis in original).  As a consequence, the Model Plaintiffs allege that they and their families have suffered financial hardship.

The Complaint additionally alleges that the defendants failed to honor their obligations to secure modeling work for the Model Plaintiffs.  Specifically, the Model Plaintiffs allege that the defendants failed to use their best efforts to secure modeling jobs and otherwise grossly mismanaged the Model Plaintiffs' careers.  Moreover, none of the Model Plaintiffs ever appeared in an L.A. Looks advertisement nor did they make a walk-on appearance on "Just Shoot Me."

### 2. Facts Relevant to Jessica Kuncl

In May 2001, Model Plaintiff Kuncl entered the 2001 Contest by appearing at a local mall event near her hometown in Baltimore, Maryland.  At the event, defendants' representatives allegedly promised her that she could "win the grand prize of $100,000 and an exclusive two-year modeling contract" if she entered the competition.  Compl. ¶ 93.  Moreover, they told her that the Contest winner would appear in an L.A. Looks advertisement and a walk-on appearance on "Just Shoot Me." Kuncl was 14 years old at the time.

Two weeks later, Kuncl received the aforementioned congratulatory letter from Schwarzkopf and the accompanying agreements.  Kuncl and her mother signed both agreements and returned them to the defendants.  Kuncl subsequently won the Grand Prize at the 2001 Contest, prompting defendants to issue a press release in Maryland stating: "Local Teen – Jessica Kuncl –

Wins L.A. Looks Model Search $100,000.00 Grand Prize!" Compl. ¶ 100 (emphasis deleted). Kuncl subsequently signed a model management agreement with N.Y. Models in order to effectuate her prior agreements with defendants (hereinafter, all such agreements signed with N.Y. Models will be referred to as the "N.Y. Models Agreements"). At all relevant times thereafter, Kuncl was primarily managed by N.Y. Models' employees/agents at its New York office. N.Y. Models represented that they would look out for Kuncl's best interests at all times as her mother agent[7] and fiduciary.

During Kuncl's time at N.Y. Models, she traveled throughout the world, including France, Spain, and Italy, to appear for castings, "go sees,"[8] auditions, and bookings, or confirmed jobs. Kuncl appeared in numerous national and international magazines, including "Elle," "YM," and "Seventeen." She also worked as a runway model in Japan and other countries. Defendant Holba praised Kuncl's work in an interview with "The Baltimore Sun," stating, "Jessica's an international model . . . she's suited for all markets." Compl. ¶ 106. However, Kuncl alleges that the defendants "routinely sent [her] on pointless and

---

[7]     The "mother agency" is a model's primary agent and is empowered to enter into agreements with other agencies in markets not serviced by the "mother agency."

[8]     A "go see" is a form of audition in which the modeling agency arranges for a specific model to "go see" a client, who may or may not decide to hire the model.

inappropriate castings and assignments that failed to generate income" and that they "failed to set up or garner sufficient appointments, castings, or 'go sees' for" her. Compl. ¶ 107.

The Complaint alleges that despite all the modeling work Kuncl did, and despite the fact that all the clients who eventually retained Kuncl paid the defendants for her services, Kuncl was never paid any of the $100,000 owed to her under the L.A. Models Agreement.[9] The defendants not only failed to pay Kuncl, but also demanded that she and her family pay them more than $20,000. Despite defendants' alleged failure to pay Kuncl, an employee of N.Y. Models sent her a letter on September 20, 2004, stating that N.Y. Models "strongly believes in your ability as a model and your guaranteed contract remains in full force." Compl. Ex. L. Nonetheless, Kuncl alleges that she has yet to be paid any money by any of the defendants.

### 3. Facts Relevant to Plaintiff Bezuszka

Model Plaintiff Bezuszka alleges that in May 2001, he was "discovered" by an agent of the defendants while he was at an "event" they sponsored at a store in Detroit, Michigan.[10] This agent informed Bezuszka that he would "work very well" as a model and encouraged him to enter the 2001 L.A. Looks Model

---

[9]    Kuncl's family also incurred considerable expenses in traveling with her, although the Complaint acknowledges that the defendants never promised to reimburse her family for their expenses.

[10]    The Complaint does not specify which defendants sponsored this event, nor does it specify the type of event.

Contest, mentioning the $100,000 grand prize and two-year modeling contract. At the time he was approached, Bezuszka was 21 years old and attending Western Michigan University on a soccer scholarship. Bezuszka was already represented by the Ford Modeling Agency in Chicago, but decided to enter the 2001 Contest anyway in order to increase his exposure. Two weeks after filling out the required forms, Bezuszka was sent the same congratulatory letter sent to the other Model Plaintiffs, which informed him that he was one of 12 finalists in the 2001 Contest. Bezuszka signed the L.A. Models Agreement and the Contestant's Agreement and subsequently competed in the 2001 Contest, where he was named the first runner-up. Under the terms of the agreements he signed, Bezuszka was awarded a $50,000/2-year modeling contract with L.A. Models.

Like Kuncl, Bezuszka signed an agreement with N.Y. Models effectuating the parties' earlier agreements. Bezuszka similarly alleges that the modeling agencies promised that they would use their best efforts to foster his career and that N.Y. Models would serve as his "mother agent" and fiduciary. In reliance on these representations, Bezuszka purchased a new vehicle and dropped out of college, having been convinced by the L.A. Models Defendants that he would be "too old" upon graduation to earn a living as a model. Compl. ¶ 128.

Moreover, the L.A. Models Defendants convinced Bezuszka to sever his relationship with the Ford Modeling Agency.

Bezuszka alleges that the L.A. Models Defendants altogether failed to pay him and also failed to set up sufficient modeling opportunities for him. In October 2003, Bezuszka asked why he had not received any money; the L.A. Models Defendants replied that he was not being paid because he did not live in New York, despite the lack of any requirement that he reside there. Like Kuncl, Bezuszka also claims he was never cast in an L.A. Looks print advertisement or cast in a walk-on role in "Just Shoot Me."

### 4. Facts Relevant to Plaintiff Suliman

In April 2001, Model Plaintiff Suliman, a resident of Hawaii, alleges that her "then mother agent"[11] contacted N.Y. Models about representing Suliman. Compl. ¶ 138. N.Y. Models expressed interest in Suliman, who was then 13 years old, and sent her a management agreement. In May 2001, Holba flew to Hawaii to meet her. During this meeting, Holba allegedly guaranteed Suliman "Top Place" in the "Regional Competition" of the 2001 Contest, thus guaranteeing her a spot in the National Finals. Compl. ¶ 141. Holba also represented that Suliman would win one of the top three prizes. On May 12, 2001, plaintiff competed in the Regional Competition in Oahu, Hawaii,

---

[11] The Complaint does not specify the identity of this mother agent.

where Holba and two other judges awarded her First Place and informed her she was a finalist in the 2001 Contest.

Although Suliman was sent a congratulatory letter from Schwarzkopf, she was not presented with any form of written agreement prior to the 2001 Contest. At the Contest, Suliman won one of two Second Runner-Up prizes, for which she was promised a two-year/$30,000 modeling contract with the L.A. Models Defendants. Immediately afterwards, defendants requested that Suliman travel to New York, where she stayed in N.Y. Models' "models apartment" during June and July. Compl. ¶ 151. Suliman signed a Management Agreement with N.Y. Models on July 8, 2001, and was sent on several castings and "go sees," but received no work. Regardless, Suliman decided to be home schooled for the 2001-2002 school year in order to make herself available to defendants.

Suliman alleges that the L.A. Models Defendants did not adequately manage her career and failed to pay her any of  the $30,000 in "guaranteed income" promised to her. During the two-year contract period and with the consent of the defendants, Suliman continued to be represented by her "mother agency" in Hawaii, which Suliman alleges obtained and paid her for modeling work. Suliman further alleges that she made due demand for payment from the defendants, but has yet to receive any money.

**5. Facts Relevant to Plaintiff Miller**

In early 2001, plaintiff Miller "discovered" Jessica Stam, whom she considered to have great potential to succeed as a fashion model. Miller and Stam subsequently entered into a "mother agency" agreement, whereby Stam agreed that Miller would represent her throughout the world. In about February 2002, Miller introduced Stam to N.Y. Models while they were in New York. N.Y. Models informed Miller of its interest in Stam, but Miller declined its offer to sign Stam because Miller believed at that time that defendants had improperly "stolen" a model that Miller had represented. Compl. ¶ 194. In about May 2002, Erik Lundgren ("Lundgren"), an employee of N.Y. Models, reiterated his company's interest in representing Stam. Miller again declined, and thereafter stopped fielding phone calls from Lundgren.

In mid-July 2002, the agency that had been representing Stam in New York ceased operations, prompting Miller to schedule various appointments seeking new representation for Stam in New York. Stam decided to meet again with N.Y. Models, which suggested that Stam enter the 2002 L.A. Look Model Search Contest. Lundgren then suggested this idea to Miller, representing that if Stam entered the 2002 Contest, the L.A. Models Defendants would ensure that she won the $100,000 Grand Prize. Lundgren represented that if Stam were to agree to enter the contest, the L.A. Models Defendants would continue to honor

the "mother agency" agreement with Miller. Moreover, the L.A. Models Defendants told Miller and Stam that Stam would make a great deal of money and that her career would otherwise significantly benefit if she agreed to enter.

Miller alleges that at the time these representations were made, the L.A. Models Defendants knew that: (1) they could not "guarantee" income for Stam; (2) they had no certain jobs or guarantees of work ready for Stam; (3) they never intended to give Stam $100,000; (4) they never intended to honor the mother agency agreement between Miller and Stam; (5) their agreements with Stam would interfere with Stam's agreement with Miller; (6) Stam was technically ineligible to enter the contest as a Canadian citizen; and (7) their agreements would interfere with other prospective business between Stam, Miller, and other agencies or clients.

Nonetheless, Miller permitted Stam to enter the 2002 Contest, unaware of the L.A. Models Defendants' alleged misrepresentations. On July 30, 2002, Miller and N.Y. Models executed a Mother Agency Agreement (the "MAA"), stating that, "New York Model Management will be representing [Stam] in New York, NY ONLY." Compl. Ex. P. Under the MAA, Miller was to receive 10% of Stam's gross earnings resulting from N.Y. Models' representation of her in New York. On July 31, 2002,

unbeknownst to Miller, defendants[12] induced Stam, a minor, to sign a "Contestant's Agreement" with them. Moreover, Miller alleges that the defendants actively sought to conceal this agreement from her.

On September 5, 2002, Stam indeed won the 2002 Contest. The Complaint alleges that Stam told Miller that she would be "handed over $100,000" when she won. Compl. ¶ 214. In October 2002, N.Y. Models applied for and sponsored a work visa for Stam to permit her to work in the United States. Soon after, however, Stam expressed disappointment at the way in which the L.A. Models Defendants were managing her career, as they allegedly procured little or no work for her and had yet to pay her any of the $100,000 promised to her. Miller also experienced difficulties dealing with the L.A. Models Defendants, who "attempted to improperly exceed the scope of [the MAA] and attempted to unduly influence Stam to the detriment of [Miller]." Compl. ¶ 221. Miller alleges that they behaved in this manner "with the intent of inducing Stam to breach her mother agency agreement with plaintiff Miller." Id. at ¶ 224. As a result of these disagreements among Stam, Miller, and the L.A. Models Defendants, Stam, who was still a

---

[12]   Again, this is an instance where the Complaint does not specify to which defendants it is referring. Presumably, the Complaint is referring to N.Y. Models here. However, because this Contestant's Agreement is not attached as an exhibit to the Complaint, unlike most of the other agreements referenced, we cannot be certain which defendant[s] the Complaint intends to describe.

minor, legally disavowed her contract in February 2003 and signed with International Model Management ("IMM"), another New York modeling agency.

On April 15, 2003, N.Y. Models, L.A. Models, Holba, and L.A. Look Model, Inc.[13] filed suit against Miller and IMM in the Southern District of New York, alleging tortious interference with contract, tortious interference with prospective economic relations, breach of contract, breach of implied covenant of good faith and fair dealing, defamation, unfair competition, and misrepresentation.[14] On May 14, 2004, Judge Holwell granted summary judgment for the defendants, dismissing the complaint in its entirety. See NYC Mgmt. Group, Inc. v. Brown-Miller, 03 Civ. 2617(RJH), 2004 WL 1087784 (S.D.N.Y. May 14, 2004). Judge Holwell explained that all of the admissible evidence suggested that Stam, not Miller, was unhappy with N.Y. Models' representation of her, and that Miller "in fact[] attempted to persuade Stam to stay with N.Y. Models." Id. at *7. Moreover, the Court found that the plaintiffs had presented no evidence that Miller acted with malicious intent. Id. at *8.

---

[13]    L.A. Look Model, Inc. has no legal relationship with L.A. Looks hair care products and is not a party to this lawsuit.

[14]    While that case was pending, on February 3, 2004, N.Y. Models filed a lawsuit against Stam in state court, which was subsequently removed to the Southern District of New York. This case was discontinued without restoration.

The instant complaint alleges that after Stam disaffirmed her contract with the L.A. Models Defendants, they "intentionally and improperly sought to interfere" with Miller's relationship with Stam, as well as their relationships with various clients and modeling agencies. Specifically, Miller alleges that the L.A. Models Defendants: (1) filed "baseless" actions against Miller and Stam; (2) threatened retaliation against Stam, Miller, and third parties for Stam's disaffirming her contract, and; (3) "improperly assert[ed] Stam's immigration status and visa sponsorship by defendants as a means of preventing Stam from working with other agencies or for other clients . . . ." Compl. ¶ 229. Miller now brings claims for breach of the MAA, fraud, tortious interference with existing contracts, and for an accounting against the L.A. Models Defendants.

## DISCUSSION

### I. Standard of Review

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court is obligated to accept as true all well-pleaded factual allegations in the Amended Complaint, and view them in the light most favorable to plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Hertz Corp. v. City of New York, 1 F.3d 121, 125 (2d Cir. 1993). A defendant's motion is to be granted only where "it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Still v. DeBuono</u>, 101 F.3d 888, 891 (2d Cir. 1996) (citing <u>Conley v. Gibson</u>, 355 U.S. 41, 48 (1957)).

## II. Model Plaintiffs' Breach of Contract and Quantum Meruit Claims

The Model Plaintiffs' first and second causes of action allege that the defendants materially breached the "Contest Contract" and the "Mother Agent" Agreement, respectively, by, <u>inter alia</u>, failing to pay the "guaranteed income" provided for in the L.A. Models Agreement.[15] Their third cause of action alleges that they may recover under a theory of quantum meruit or unjust enrichment. Defendants move to dismiss for failure to state a claim. For the reasons discussed below, we grant the motion of defendants Schwarzkopf and Holba to dismiss all three causes of action, but deny the motion made by the L.A. Models Defendants to dismiss the breach of contract claim.

---

[15]    The Complaint refers both to "oral agreements and written contracts," Compl. ¶ 231, though we are entirely unclear as to what oral agreements were alleged that were not subsumed by the written contracts. Whatever verbal representations were made all seemed to relate to the promise to provide the contest winners with written contracts. Consequently, in finding that the Model Plaintiffs have stated a claim for breach of contract against the L.A. Models Defendants, we are referring only to the actual written contracts, not to any oral agreements. The Complaint fails to adequately allege any agreements made outside the scope of the written contracts, a point discussed in greater detail <u>infra</u>.

## A. Choice of Law

Both the Contestant's Agreement and the L.A. Models Agreement explicitly state that they are to be construed in accordance with California law. <u>See</u> Compl. Ex. F, G, H, O. The N.Y. Models Agreements provide that they are governed by New York law. <u>See</u> Compl. Ex. M. Because we find that all of the agreements signed by the Model Plaintiffs are enforceable, we also give effect to the relevant choice of law provisions.

## B. Elements of a Breach of Contract Claim

Under California law, there are four elements of a breach of contract claim: (1) a valid contract between the parties; (2) performance by the plaintiff (3) an unjustified or unexcused failure to perform by the defendant; and (4) damages to plaintiff caused by the breach. <u>Bhari Info. Tech. Sys. Pvt., Ltd. v. Allied Boston Bank Inc.</u>, No. C 05-01223 SI, 2005 WL 3481473 at *5 (N.D. Cal. Dec. 20, 2005) (citing <u>Careau & Co. v. Sec. Pac. Bus. Credit, Inc.</u>, 222 Cal. App. 3d 1371, 1388, 272 Cal. Rptr. 387, 395 (Cal. Ct. App. 1990)). As the elements of a breach of contract claim are identical under New York law, we may analyze all of the Model Plaintiff's breach of contract claims under the same standard despite the fact that two of the agreements are governed by California law and one is governed by New York law. <u>See</u>, <u>e.g.</u>, <u>Bonnie & Co. Fashions, Inc. v. Bankers</u>

<u>Trust Co.</u>, 945 F. Supp. 693, 711 (S.D.N.Y. 1996) (reciting the four elements of a breach of contract claim under New York law).

**C. Claims against Schwarzkopf**

Schwarzkopf moves to dismiss the Model Plaintiff's breach of contract claims on the grounds that it did not breach any of its obligations under the Contestant's Agreement. In support of Schwarzkopf's argument that any failure of the other defendants to pay the Model Plaintiffs does not render Schwarzkopf liable, it points to contract language stating that: "L.A. Models bears sole responsibility for all execution and payment of the contracts. The contracts between L.A. Models and the winners shall be covered in a separate agreement." Ex. H, ¶ 6(a). Moreover, the Contestant's Agreement contains a limitation of liability clause that explicitly releases Schwarzkopf from any liability arising out of the Model Plaintiffs' agreements with the L.A. Models Defendants. <u>See</u> <u>id.</u> at ¶ 4(e). Consequently, Schwarzkopf maintains that it may not be held liable for breach of contract, as the only breaches alleged involve the conduct of the L.A. Models Defendants.

The Model Plaintiffs contend that Schwarzkopf may properly be held liable because it would be unconscionable to enforce the limitation of liability clause in the Contestant's Agreement. This argument is wholly without merit. The mere suggestion that the Model Plaintiffs did not have a "meaningful choice," Pl.

Memo. of Law at 11, in deciding whether to sign the contract is implausible. Besides a desire to participate in the modeling competition, there was absolutely no reason the Model Plaintiffs should have felt compelled to sign the contracts.[16] Moreover, this was not a situation, as the Model Plaintiffs suggest, involving a "classic disparity of bargain power," pitting the "young, impressionable, inexperienced minors" against a large corporation; Kuncl and Suliman each had a parent sign the Contestant's Agreement, and Bezuszka, who had already signed a modeling agreement with another agency, was 21 years old when he signed. Pl. Memo. of Law at 12.

The California Courts have developed two tests for determining whether a contract or one of its provisions is unconscionable, but "[b]oth pathways should lead to the same result." Morris v. Redwood Empire Bancorp., 27 Cal. Rptr. 3d 797, 805-06 (Cal. Ct. App. 2005). One test requires the court to first determine whether a contract is one of adhesion, then, if it finds as much, to determine whether "(a) the contract was outside of the reasonable expectations of the [weaker] part[y], or (b) was unduly oppressive or unconscionable." Id. at 805 (internal quotations omitted). The other test has both

---

[16]    Although the Model Plaintiffs complain of only having three days to review the Contestant's Agreement before signing it, this is more than enough time to read a 3 ½ page agreement written in readily understandable language. See Compl. Ex. H.

"procedural" and "substantive" elements, and requires the court to determine both whether oppression or surprise was involved in inducing the weaker party to sign and whether the terms themselves "shock the conscience" of the court. See id. at 805-06 (internal citations omitted); see also 24 Hour Fitness, Inc. v. Superior Court, 78 Cal. Rptr. 2d 533, 541 (Cal. Ct. App. 1998). Under this second test, a contract may only be invalidated if it is both procedurally and substantively unconscionable.[17]

The Contestant's Agreement does not satisfy either of these tests. The Complaint simply does not allege any sort of external pressure placed on the Model Plaintiffs or an unreasonably short amount of time to review the Contestant's Agreement. Although the Model Plaintiffs complain of the limitation of liability clause, their only interest in having it declared unconscionable is to enable them to recover from Schwarzkopf. However, a mere desire to invalidate a contract does not affect whether or not it would be unconscionable to

---

[17] Although we apply California law to the breach of contract claims, we note that the New York test for unconscionability is similar to the second California test, as it contains both procedural and substantive elements. See, e.g., People by Abrams v. Two Wheel Corp., 71 N.Y.2d 693, 699, 530 N.Y.S.2d 46, 49 (1988).

enforce it.   In short, the facts, as pled, do not remotely suggest unconscionability.[18]

Having found that the limitation of liability clause is enforceable, we dismiss the Model Plaintiff's breach of contract claims against Schwarzkopf.  Although the first cause of action refers to the "defendants" generally, it is clear that the breach of contract claims arise out of the contracts entered into by the L.A. Models Defendants, not Schwarzkopf, and their alleged failure to make payments to the Model Plaintiffs and otherwise honor their agreements.   Thus, the Complaint has failed to allege a breach of any agreement to which Schwarzkopf was a party.

## D. Claims against L.A. Models

L.A. Models moves to dismiss the Model Plaintiffs' breach of contract claims on the grounds that the Complaint "violate[s] basic pleading principles" by failing to distinguish among the defendants.   L.A. Models Mem. of Law at 6 (citations omitted). Although we agree that the Complaint is not a model of clarity, we believe that the nature of the breach of contract

---

[18]   We note that it is unusual for an unconscionability argument to be made offensively, that is, to allow affirmative recovery, rather than defensively in order to prevent the weaker party from being harmed by enforcing an unconscionable contract.  Here, the harm alleged does not result from the enforcement of any unduly harsh contractual provision, but rather from the L.A. Models Defendants' alleged failure to pay monies owed under the L.A. Models Agreement. In short, the Model Plaintiffs cannot seek to void the contracts they signed simply because they would rather seek recovery under a different theory.

allegations, and the underlying facts alleged in their support, is sufficiently clear such that it may not be dismissed for failing to distinguish among the defendants.

We also find that the Complaint adequately alleges the four elements of a breach of contract claim against L.A. Models. First, it clearly alleges the existence of a contract. <u>See</u>, <u>e.g.</u>, Compl. ¶ 231 ("the Model Plaintiffs did enter into agreements with the defendants, including oral agreements and written contracts . . . "). Second, the Complaint alleges that each Model Plaintiff complied with his or her obligations under the L.A. Models Agreement. <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 79 (all Model Plaintiffs), 113 (Kuncl), 131 (Bezuszka) & 155 (Suliman). Third, the Complaint repeatedly alleges that L.A. Models unjustifiably failed to fulfill its contractual obligations. <u>See</u>, <u>e.g.</u>, Compl. ¶ 236 ("defendants have failed and/or refused to honor the contests' promises, without any cause or justifiable reason"). Finally, the Complaint adequately alleges that the Model Plaintiffs were harmed as a result of the breach. <u>See</u>, <u>e.g.</u>, Compl. ¶¶ 239, 240, 242. The Model Plaintiffs have thus stated a cause of action for breach of contract against L.A. Models.

**E. Breach of Contract Claims against N.Y. Models**

The Model Plaintiffs also state a claim for breach of contract against N.Y. Models. Although we again agree that the

25

Complaint fails to clearly distinguish among defendants, we find that the factual allegations are sufficient to withstand a motion to dismiss. The Complaint alleges that: (1) N.Y. Models entered into contracts with the Model Plaintiffs to serve as their "mother agent"; (2) the Model Plaintiffs performed under those contracts by making themselves available for modeling work; (3) N.Y. Models unjustifiably failed to perform its obligations; and (4) the Model Plaintiffs were harmed as a result. See Compl. ¶¶ 89, 231, 236, 239, 240, 242. Consequently, we deny N.Y. Models' motion to dismiss for failure to state a claim for breach of contract.

**F. Breach of Contract Claims against Holba**

The Model Plaintiffs contend that Holba may be held personally liable for breach of contract. This argument is wholly without merit, as the Complaint fails to allege a basis upon which we could find that Holba should be subject to personal liability.[19] It is axiomatic that "[c]orporate officers . . . cannot ordinarily be held personally liable for the acts or obligations of their corporation." Taylor-Rush v. Multitech

---

[19] The Court is troubled by the statement made by plaintiffs' counsel during oral argument that, "[w]e don't know that [Holba] was necessarily acting within the scope of L.A. Models and New York Models," Tr. of Jan. 13, 2006 Conf. ("Tr.") at 69, given the absence of any allegation in the complaint that he was not acting within the scope of his employment. Plaintiffs' counsel has apparently gone to great lengths to advertise the fact that he was suing Holba, a well-known figure in the modeling industry, despite being improperly casual in asserting any claim against Holba.

_Corp._, 217 Cal. App. 3d 103, 113, 265 Cal. Rptr. 672, 677 (Cal. Ct. App. 1990). The exceptions to this rule only apply where an officer has either personally directed the commission of a tort or the complaint alleges a basis upon which to pierce the corporate veil. Neither of these exceptions applies here. First, the only specific allegations concerning Holba mention his role as a judge in the competition and the fact that he had a few conversations with the Model Plaintiffs. These facts are far from sufficient to suggest that Holba personally directed a wrongful act, and, as discussed _infra_, we dismiss all of the non-contract based claims of the Model Plaintiffs. Moreover, Holba did not personally sign any of the agreements. Second, the complaint does not allege that Holba was the _alter_ _ego_ of his companies, nor is this a case in which veil piercing is appropriate. Under California law, piercing the veil requires: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." _Say_ _& Say, Inc. v. Ebershoff_, 20 Cal. App. 4th 1759, 1768, 25 Cal. Rptr. 2d 703, 709 (Cal. Ct. App. 1993) (citation omitted). As the complaint does not allege either of these elements, Holba's motion to dismiss the Model Plaintiffs' breach of contract claims is granted.

## G. Punitive Damages

Despite the Model Plaintiff's request for punitive damages, see Compl. ¶ 242, they are unavailable for a breach of contract claims under both California and New York law. Besides the fact that the agreements the Model Plaintiffs signed with the L.A. Models Defendants expressly limit recovery to actual damages, both California and New York require that an independent tort be alleged in order to support a claim for punitive damages arising out of a breach of contract. See Applied Equip. Corp. v. Litton Saudi Arabia Ltd., 869 P.2d 454, 460, 462 (Cal. 1994); New York Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 316, 662 N.E.2d 763, 767-68 (1995). As discussed below, the Model Plaintiffs fail to state a cause of action sounding in tort, such that they may not recover punitive damages.

## H. Quantum Meruit

The third cause of action is for quantum meruit, or unjust enrichment. Although the Model Plaintiffs argue that they are entitled to present both breach of contract and quantum meruit theories to the jury, they may not do so under these circumstances. In New York, the general rule is that "where there is an express contract no recovery can be had on a theory of implied contract." Knobel v. Manuche, 146 A.D.2d 528, 530, 536 N.Y.S.2d 779, 781 (1st Dep't 1989) (internal citation and quotations omitted). An exception exists "where the defendant

has frustrated the plaintiff's performance of his duties under the contract," id., but the Complaint only alleges that the defendants failed to perform, not that the Model Plaintiffs were unable to fulfill their own contractual obligations. Indeed, the complaint alleges quite the opposite. Moreover, there is no "genuine dispute as to the existence of a contract," Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996) (citation omitted), as discussed supra and as evidenced by the contracts themselves, attached as exhibits to the Complaint. California law also precludes our entertaining a cause of action for quantum meruit. See Lance Camper Mfg. Corp. v. Republic Indem., 44 Cal. App. 4th 194, 203, 51 Cal. Rptr. 2d 622, 628 (Cal. Ct. App. 1996) ("it is well settled that an action based on an implied-in-fact or quasi-contract cannot lie where there exists between the parties a valid express contract covering the same subject matter."). We thus dismiss the third cause of action.

## I. Subject Matter Jurisdiction

Because we dismiss all of the plaintiffs' claims except for those involving breach of contract, as discussed infra, only Kuncl independently satisfies the amount in controversy requirement, as her contract provided for $100,000 in income. See 28 U.S.C. § 1332(a) ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs, and is between . . . citizens of different States . . . "). We must therefore decide whether to exercise supplemental jurisdiction over Bezuszka's and Suliman's claims, as their contracts have face values of only $50,000 and $30,000, respectively.

The federal supplemental jurisdiction statute provides, in relevant part:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

28 U.S.C. § 1367(a). Here, Bezuszka and Suliman signed agreements identical to the ones signed by Kuncl. They also allege nearly identical misconduct on the part of the L.A. Models Defendants as Kuncl does. Consequently, we find that the exercise of supplemental jurisdiction over their breach of contract claims is proper.[20]

---

[20]    Moreover, none of the exceptions set forth at 28 U.S.C. §§ 1367(b) or (c) are applicable here.

## III. Remaining Claims by Model Plaintiffs

The fourth cause of action alleges that the defendants engaged in fraud and intentional misrepresentation regarding promises made in connection with the 2001 Contest. The fifth cause of action alleges deceptive acts and practices and false advertising in violation of New York Gen. Bus. Law. §§ 349 and 350, et seq. (McKinney 2004). The sixth cause of action alleges unlawful, unfair, and deceptive business practices in violation of Cal. Bus. & Prof. Code § 17200, et seq. (West 2004). The seventh cause of action alleges false and misleading advertising in violation of Cal. Bus. & Prof. Code § 17500, et seq. (West 2006). The eighth cause of action seeks a declaratory judgment against all defendants.[21] The ninth cause of action seeks an accounting of the L.A. Models Defendants' "financial affairs as pertains to the parties' agreements."[22] Compl. ¶ 311. The tenth cause of action seeks to impose a constructive trust over the prize monies allegedly awarded to the Model Plaintiffs. The defendants move to dismiss all of these claims pursuant to Rule

---

[21]   This claim is improperly labeled a "cause of action" as it is in fact a remedy sought by plaintiffs for their state law claims. For the reasons discussed infra, we dismiss these claims, such that the Model Plaintiffs are not entitled to a declaratory judgment.

[22]   Plaintiff Miller joins the ninth cause of action. For the reasons discussed infra, we dismiss all of her claims as barred by Rule 13. Regardless, like the Model Plaintiffs, she fails to meet the pleading requirements to state a claim for an accounting.

12(b)(6).  For the reasons that follow, defendants' motion is granted.

## A. The Model Plaintiffs fail to state a cause of action sounding in fraud

The Model Plaintiffs allege that the defendants "did consciously and deliberately mislead the [Model Plaintiffs] . . . into believing that if they won the contest[] they would be awarded prize money and a modeling contract, not simply a 'guarantee of income' with numerous conditions, restrictions and deductions."  Compl. ¶ 253.  They further allege that the "defendants made such knowing misrepresentations with the intent of fraudulently inducing [them] . . . into entering into an exclusive agreement [sic] with defendants for services as models, and to prevent plaintiffs . . . from entering into agreements with any other modeling agencies."  Id. at ¶ 257.

These allegations fail to state a cause of action sounding in fraud.  Plaintiffs may not plead fraud in order to seek consequential damages that they would not be entitled to recover under a breach of contract theory.  Here, all of the alleged improper acts fall squarely within the scope of the agreements signed by the Model Plaintiffs, such that they may not form the basis for a fraud claim.  Moreover, the Complaint fails to plead fraud with particularity, as required by Fed. R. Civ. P. 9(b).

**i. Model Plaintiffs' Breach of Contract Claims Preclude Fraud Claim**[23]

To prove fraud under New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Bangue Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995) (citing Bridgestone/Firestone, Inc. v. Recovery Credit Sys., Inc., 98 F.3d 13 (2d Cir. 1996)). In addition, a fraud claim must be "sufficiently distinct from

---

[23] Our discussion focuses on New York law and cases, as the parties both assumed application of New York law to the fraud claims in their memoranda of law. However, California cases similarly provide that a breach of contract claim may not be pled as fraud absent evidence of an independently tortious act. See, e.g., Harris v. Atlantic Richfield Co. 14 Cal. App. 4th 70, 78, 17 Cal. Rptr. 2d 649, 654 (Cal. Ct. App. 1993) ("when one party commits a fraud during the contract formation or performance, the injured party may recover in contract and tort"). Here, the Complaint makes no allegation of fraud independent of the contract. Moreover, "[u]nder California law . . . , 'a written contract presumptively supersedes all prior or contemporaneous oral agreements concerning the subject matter of the written contract.'" Sanguinetti v. Viewlogic Sys., Inc., No. C 95 2286 TEH, 1996 WL 33967 at *12 (N.D. Cal. Jan. 24, 1996) (quoting Sullivan v. Mass. Mutual Life Ins. Co., 611 F.2d 261, 264 (9th Cir. 1979)) (additional citations omitted). Thus, the Model Plaintiffs' allegations that defendants made additional promises relating to the subject matter of the contracts prior to their signing may not form the basis for a fraud claim.

Regardless, it appears that the Model Plaintiff's fraud claims would be barred by California's three-year statute of limitations, as the contracts were all signed in May 2001 and the initial complaint in this action was filed on September 29, 2004. Additionally, as discussed below, the failure to plead fraud with particularity bars the Model Plaintiff's fraud claims regardless of whether they are analyzed pursuant to New York or California law.

the breach of contract claim," Papa's-June Music, Inc. v. McLean, 921 F. Supp. 1154, 1162 (S.D.N.Y. 1996), and "a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise." Id. at 1160 (citing cases). When a fraud claim is brought based on the same circumstances that give rise to a breach of contract claim, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract . . . or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract . . . or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." Bridgestone/Firestone, 98 F.3d 13, 20 (omitting citations). On the other hand, in some circumstances "a misrepresentation of a present fact that induces a party to enter into a contract is actionable as fraud." Gulf Coast Dev. Group v. Lebor, 02 Civ. 6959(NRB), 2003 WL 22871914 at *6 (S.D.N.Y. Dec. 3, 2003) (citing Bridgestone/Firestone, 98 F.3d at 20).

The Model Plaintiffs' fraud allegations fail to fall into any of these exceptions. First, the Model Plaintiffs do not allege any sort of special relationship among the parties or other situation that would give rise to a legal duty apart from the parties' contractual relationships. Second, each of the alleged misrepresentations involves the very issues addressed in

the contracts, including the income guaranteed to the Model Plaintiffs and the defendants' responsibility to promote the models and secure work for them. Third, there are no special damages alleged that could not be recovered under a contract theory. In short, all of the alleged misconduct of which the Model Plaintiffs complain occurred under the rubric of the contractual relations among the parties, such that the fraud allegations are entirely indistinct from the claims for breach of contract. The allegations that are couched in the language of fraud are no more than breach of contract allegations masquerading as something more. Here, the Complaint alleges that the Model Plaintiffs signed contracts with the defendants, who subsequently did not fulfill their obligations. These facts simply cannot give rise to a fraud claim.

### ii. Model Plaintiffs Fail to Plead Fraud With Particularity

Even if the Model Plaintiffs could plead fraud in this context, they have failed to do so with particularity, as required by Fed. R. Civ. P. 9(b). Rule 9(b) "requires that '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity,' an exception to the generally liberal scope of pleadings allowed by Rule 8, Fed. R. Civ. P."[24]    <u>Luce v.</u>

---

[24]    Regardless of what state law applies to the Model Plaintiffs' fraud claims, they are nonetheless obligated to meet the heightened

Edelstein, 802 F.2d 49, 54 (2d Cir. 1986) (citing Ross v. A.H. Robins Co., 607 F.2d 545, 557 (2d Cir. 1979), cert. denied, 446 U.S. 946 (1980)). In order to satisfy the requirements of Rule 9(b), a complaint alleging fraud "must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993). "Additionally, where multiple Defendants are alleged to have committed fraud, the Complaint must 'allege specifically the fraud perpetrated by each defendant.'" Simon v. Castello, 172 F.R.D. 103, 105 (S.D.N.Y. 1997) (quoting Natowitz v. Mehlman, 542 F. Supp. 674, 676 (S.D.N.Y. 1982)).

The Model Plaintiffs cite to numerous statements in the Complaint to justify their belief that they have complied with Rule 9(b). Most of the paragraphs cited, however, merely recite the terms of the contracts signed by the Model Plaintiffs and quote from the defendants' press releases. See, e.g., Compl. ¶¶ 33-35, 37, 39. Moreover, the specific recitations beneath the heading for the fraud cause of action only generally aver fraudulent conduct; they do not specify the identity of the speakers or the date of the alleged misrepresentations. See,

_____

pleading requirements of Rule 9(b). See, e.g., Inn Chu Trading Co. v. Sara Lee Corp., 810 F. Supp. 501, 506-07 (S.D.N.Y. 1992).

e.g., Compl. ¶ 256 (alleging that the "defendants . . . deceived the plaintiffs . . . by, among other things: (i) misrepresenting the true nature of the contest prizes; (ii) misrepresenting their ability to 'guarantee' income . . . "). Beyond alleging that misrepresentations were made, the Complaint fails to state who made the representations. As noted above, in a multi-defendant case, generally alleging that the "defendants" engaged in fraud falls short of the heightened standard of Rule 9(b). See Mills, 12 F.3d at 1175 ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'"). Moreover, the Model Plaintiffs fail to allege with particularity that they reasonably relied on the alleged misrepresentations. Although the Complaint alleges that the Model Plaintiffs turned down educational opportunities and other employment in reliance on the defendants' representations, see Compl. ¶ 264, without more specific allegations of why this reliance was reasonable, it is difficult for the Court to conclude that this element of a fraud claim has been adequately pled. If the Model Plaintiffs had indeed not been paid during the entirety of the two-year contract terms, it strains credulity that they could continue to reasonably rely on the defendants' representations. In sum, the Model Plaintiffs have failed to plead fraud with particularity, providing an independent basis for dismissal of their fourth cause of action.

**B. The Model Plaintiffs Fail to State a Claim under New York Gen. Bus. Law §§ 349 and 350, et seq.**

The Model Plaintiffs allege that the defendants' conduct constitutes deceptive acts and practices and/or false advertising in violation of New York Gen. Bus. Law. §§ 349 and 350, et seq. They claim that pursuant to these statutes, they are entitled to injunctive relief, attorney's fees, treble damages,[25] and punitive damages. The factual bases for this cause of action are the same as those for the breach of contract and fraud claims. Defendants move to dismiss pursuant to Rule 12(b)(6).

General Business Law § 349 provides in relevant part:

> (a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.
>
> . . .
>
> (h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The

---

[25] The statute plainly limits the amount of treble damages to $1,000. See NY Gen. Bus. Law § 349(h) (McKinney's 2004).

> court may award reasonable attorney's fees
> to a prevailing plaintiff.

New York Gen. Bus. Law § 349. General Business Law § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." New York Gen. Bus. Law § 350. "The standard for recovery under General Business Law § 350, while specific to false advertising, is otherwise identical to section 349." Goshen v. Mutual Life Ins. Co. of N.Y., 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863 n.1 (2002).

A prima facie case under § 349, "requires . . . a showing that defendant is engaging in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof." Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 532 (1995) (citation omitted). A plaintiff "must demonstrate that the acts or practices have a broader impact on consumers at large. Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." Id. Moreover, "the transaction in which the consumer is deceived must occur in New York." Goshen, 98 N.Y.2d at 324, 746 N.Y.S.2d at 863. The two issues we must decide, therefore, are: first, whether the Complaint alleges only private contract disputes or something broader affecting the general public, and

second, whether any misleading transaction occurred in New York. We find that the Complaint fails to adequately allege either of these required elements of a § 349 or 350 claim.

**i. The Complaint Does Not Allege Harm to Consumers or the General Public**

Sections 349 and 350 generally makes claims "available to an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising." <u>Small v. Lorillard Tobacco Co., Inc.</u>, 94 N.Y.2d 43, 55, 698 N.Y.S. 2d 615, 620 (1999). The Model Plaintiffs' claims under these sections must fail both because no harm is alleged either to consumers or to the general public. Put simply, models are not "consumers," nor are they "the general public."

Despite the Complaint's allegations that thousands of people were solicited by, and thus harmed, by the alleged misrepresentations made by the defendants in connection with the 2001 Contest, the only injuries alleged were specifically suffered by those members of the public who signed modeling contracts. In other words, the general public was unaffected by the deceptive practices alleged. Moreover, the Complaint never alleges that the Model Plaintiffs are "consumers," as the case law requires. <u>See</u> <u>P. Kaufmann, Inc. v. Americraft Fabrics, Inc.</u>, 232 F. Supp. 2d 220, 226 (S.D.N.Y. 2002) (dismissing § 349

claim where "[t]here are no allegations as to how these behaviors affected a wide range of consumers . . . or the public at large."). Rather, their alleged injuries are the result of the employment agreements they signed, not any general harm suffered by the public. Similarly, while the public at large was solicited by the defendants to participate in the 2001 Contest, the prizes were only awarded to a very small number.[26] Plaintiffs' counsel has failed to bring to this Court's attention any cases upholding a § 349 claim in a situation where the general public could not accept the defendant's offer, and we decline the invitation to extend the reach of § 349 well beyond its intended purpose of protecting the general public.

### iii. The Complaint Does Not Allege Harm in New York

In addition to failing to meet the basic pleading requirements of §§ 349 and 350 claims, it does not allege that any deception occurred in New York, as required by the case law. See Goshen, 98 N.Y.2d at 324, 746 N.Y.S.2d at 863. The three Model Plaintiffs entered the 2001 Contest in Maryland, Michigan, and Hawaii, respectively. Since the Complaint was filed, Caitlin Williams, who is a New York resident, voluntarily dismissed her claims. Consequently, no deceptive act or practice targeting the remaining Model Plaintiffs occurred in

---

[26] We note that unlike many other modeling contests, the defendants did not charge an entry fee. Consequently, members of the public who entered the competition but did not win suffered no injuries.

New York.  Even if the Model Plaintiffs are correct in alleging that the defendants, <u>inter</u> <u>alia</u>, "misrepresent[ed] the true nature of the contest prizes," Compl. ¶ 256, none of these misrepresentations occurred in New York.  Importantly, nearly the entire basis for this cause of action involves the 2002 Contest, which did occur in New York, but again, because Williams, who entered the 2002 Contest, is no longer a plaintiff, these allegations cannot form the basis for §§ 349 and 350 actions.[27]

## C. California Bus. & Prof. Code §§ 17200 and 17500

In the sixth and seventh causes of action, the Model Plaintiffs allege that the defendants' alleged misconduct violates Cal. Bus. & Prof. Code §§ 17200 and 17500.[28]  All defendants move to dismiss for failure to state a claim.  For the reasons set forth below, their motion is granted.

---

[27]  In finding that the defendants' alleged misrepresentations did not occur in New York, we again emphasize that decisions made by the Model Plaintiffs to forego educational opportunities and other work arose out of their decisions to enter into the modeling agreements.  Whether or not the Model Plaintiffs were wise in deciding to model instead of obtain educations is not a question for this Court to decide.

[28]  The Complaint never specifies under which subsections of Cal. Bus. & Prof. Code §§ 17200 and 17500 their claims arise.  The Court is thus left with the task of determining <u>sua</u> <u>sponte</u> the Model Plaintiffs' intent.

### i. Overview of UCL §§ 17200 and 17500

California Bus. & Prof. Code § 17200, <u>et seq.</u>, commonly referred to as the Unfair Competition Law ("UCL"), provides a cause of action in certain circumstances to private parties harmed as a result of unfair business practices, including false or misleading advertising.[29]  In order to state a claim under § 17200, one must allege that "members of the public are likely to be deceived" by an unlawful business practice.  <u>Quacchia v. DaimlerChrysler Corp.</u>, 122 Cal. App. 4th 1442, 1453, 19 Cal. Rptr. 3d 508, 516 (Cal. Ct. App. 2004) (internal citation and quotations omitted).  On November 2, 2004, California voters approved Proposition 64, which amended UCL § 17200, <u>et seq.</u>, in order to limit suits brought by lawyers acting as private attorneys general in situations where their clients had not suffered actual injuries as a result of the alleged unfair practices.  <u>See</u> 2004 Cal. Legis. Serv. Prop. 64 (West).  Since the passage of Proposition 64, "only persons who have been injured in fact and have lost money or property as a result of the alleged unfair competition or false advertising have standing to bring actions for relief under the UCL and the False

---

[29]    Because violations of § 17500, also known as the False Advertising Act, are actionable under § 17200, we analyze plaintiff's claims under § 17200.  <u>See</u> <u>Bivens</u>, 134 Cal. App. 4th at 863, 36 Cal. Rptr. 3d at 553 ("[s]ection 17200 prohibits any unlawful, unfair, or fraudulent business acts or practices, including deceptive or misleading advertising prohibited pursuant to section 17500.").

Advertising Act." <u>Bivens v. Gallery Corp.</u>, 134 Cal. App. 4th 847, 856, 36 Cal. Rptr. 3d 541, 548 (Cal. Ct. App. 2005).[30]

### ii. Model Plaintiffs Fail to State a Claim

In discussing whether the Model Plaintiffs state a claim under the UCL, we note at the outset that they may only seek to recover under § 17200 from L.A. Models. Schwarzkopf may not be sued under the UCL, because, as discussed <u>supra</u>, the Model Plaintiffs explicitly relinquished the right to sue Schwarzkopf in the Contestant's Agreement. Holba also may not be sued because the Complaint fails to allege any facts to suggest that he should be held personally liable for any alleged misdeeds of corporations with which he is affiliated. Finally, any injuries attributable to N.Y. Models took place in New York, such that they may not be the predicate for a suit under the California statute. Thus, the only defendant potentially subject to liability under § 17200 is L.A. Models.

---

[30] The question of whether Proposition 64 applies to pending cases is currently before the California Supreme Court. For the reasons enunciated in <u>Bivens</u>, 134 Cal. App. 4th at 856-57, 36 Cal. Rptr. 3d at 548-49, we believe that the California Supreme Court will hold that California voters intended that Proposition 64 be applied to pending cases. Regardless, because the Model Plaintiffs clearly allege an injury in fact, that element is irrelevant to our analysis, except to the extent that it precludes them from arguing that they are part of a class of plaintiffs injured by the defendants' alleged unlawful practices, as discussed <u>infra</u>. Thus, the Model Plaintiffs fail to state a claim under § 17200 in both its pre- and post- Proposition 64 forms.

In support of the UCL claims, the Complaint alleges that the defendants "deceived the [Model P]laintiffs . . . by, among other things: (i) misrepresenting the true nature of the contest prizes; (ii) misrepresenting their ability to 'guarantee' income, when in fact, they could not; (iii) misrepresenting the numerous conditions, deductions, costs and fees incurred and demanded of plaintiffs . . . ."[31]  Compl. ¶ 284.  The Model Plaintiffs argue that the defendants' actions constituted unfair business practices, which injured them by depriving them of income guaranteed to them under their contracts.  Defendants maintain that these allegations are insufficient to sustain a claim under the UCL.  We agree.

Unlike the cases that the Model Plaintiffs cite in support of their argument that they may state UCL claims, the damages sought as the result of the alleged UCL violations here are identical to those that can be recovered in their breach of contract claims.  The California Supreme Court has explained that a UCL action "is not an all-purpose substitute for a tort or contract action."  Cortez v. Purolator Air Filtration Prod. Co., 999 P.2d 706, 712 (Cal. 2000).  Cortez, a case upholding a UCL claim and upon which the Model Plaintiffs heavily rely, is readily distinguishable because the plaintiff was suing for

---

[31]    We note that of the eight factual bases pled in support of their § 17200 claim, five exclusively apply to the 2002 Contest, in which none of the Model Plaintiffs participated.

overtime wages that were <u>not</u> provided for in an employment contract. Here, in contrast, the Model Plaintiffs allege that they were not paid wages explicitly provided for in the L.A. Models Agreement. Moreover, "a UCL action based on a contract is not appropriate where the public in general is not harmed by the defendant's alleged unlawful practices." <u>Rosenbluth Internat., Inc. v. Superior Court</u>, 101 Cal. App. 4th 1073, 1077, 124 Cal. Rptr. 2d 844, 847 (Cal. Ct. App. 2002) (citation omitted). As already discussed <u>supra</u>, the general public cannot allege an injury here; only those entrants who actually won the 2001 Contest and signed contracts with the defendants can allege any injuries resulting from their allegedly unlawful practices, which allegedly arose from the signed contracts. The Model Plaintiffs thus cannot allege a harm to the general public.[32]

---

[32] We note that regardless of whether the Model Plaintiffs were able to state a claim under § 17200, their recovery would be limited to restitution. Their prayer for relief seeking "damages . . . believed to be not less than Five Million Dollars . . . and attorneys' fees . . . ," Compl. p.60 ¶ f, is patently improper. First, "restitution is the only monetary remedy expressly authorized by section 17203." <u>Korea Supply Co. v. Lockheed Martin Corp.</u>, 29 Cal. 4th 1134, 1146, 131 Cal. Rptr. 2d 29, 39 (2003) (internal citation and quotations omitted). Second, "attorney fees and damages, including punitive damages, are not available under the UCL." <u>Id.</u> at 29 Cal. 4th 1148, 131 Cal. Rptr. 2d at 40. Here, because restitution would equal any amounts not paid under the contracts, the Model Plaintiffs' UCL claims are superfluous.

The Model Plaintiffs also seek injunctive relief for their § 17200 and 17500 claims, which would similarly be inappropriate here. In light of our conclusion that any harms alleged by the Model Plaintiffs result solely from breaches of contract, it would be a misuse of the Court's equitable powers to issue an injunction when the plaintiffs have an adequate remedy at law, namely their breach of

**D. The Model Plaintiffs are Not Entitled to an Accounting**

The ninth cause of action seeks an accounting of the L.A. Models' Defendants assets. Specifically, the Model Plaintiffs allege that they may not determine the "amount of monies due plaintiffs . . . without a full and complete accounting of defendants' financial affairs." Compl. ¶ 309. The L.A. Models Defendants move to dismiss for failure to state a claim. For the reasons that follow, that motion is granted.

Under both New York and California law, a plaintiff seeking an accounting, which is an equitable remedy, must allege both a fiduciary relationship between the plaintiff and defendant and a breach of that fiduciary duty by the defendant. See Lio v. Zhong, No. 600455/05, 2006 WL 37044 at *6 (N.Y. Sup. Ct. Jan. 6, 2006) ("A cause of action for an accounting is an equitable remedy, where the essential elements are an allegation of a fiduciary relationship and a charge of wrongdoing against the parties having the duty") (citation omitted); Glue-Fold, Inc. v. Slautterback Corp., 82 Cal. App. 4th 1018, 1023 n.3, 98 Cal. Rptr. 2d 661, 664 n.3 (Cal. Ct. App. 2000) (stating that an accounting is a "cause of action available to a wronged fiduciary").

---

contract claims. Although the broad language of § 17203 does permit a court to issue an injunction despite the existence of a remedy at law, see, e.g., People v. Los Angeles Palm, Inc., 121 Cal. App. 3d 25, 32-33, 175 Cal. Rptr. 257, 262 (Cal. Ct. App. 1991), this case does not present facts that would make injunctive relief appropriate.

Thus, plaintiff would need to plead the existence of a fiduciary relationship between the models and their agencies in order to proceed with an accounting claim. The complaint, however, makes no such allegation, nor do we know of any case law suggesting that modeling agencies are fiduciaries for their models. Notwithstanding the argument made by plaintiffs' counsel at oral argument that he's "not aware of a case that says there is no fiduciary duty," Tr. 13, absent a basis for the Court to conclude that a fiduciary duty existed or that one should be imposed, we dismiss the ninth cause of action for failure to state a claim.[33]

## E. The Model Plaintiffs are Not Entitled to a Constructive Trust

The Model Plaintiffs' final cause of action alleges that the Model Plaintiffs "are the rightful owners of funds totaling over . . . $255,000.00"[34] and demands that a constructive trust be imposed on the prize monies allegedly owed to the Model Plaintiffs.[35] Defendants move to dismiss for failure to state a claim. That motion is granted.

---

[33] We note that after making this statement, plaintiff's counsel told the Court that he would be "happy to provide" us with case law substantiating his argument that a fiduciary duty existed, but failed to do so. Tr. 13.

[34] The complaint does not explain how this particular sum was determined.

[35] The complaint alleges that, "per the parties' agreements and by law, defendants were required to hold at least 15% of a minor's gross payments in an 'established trust account.'" Compl. ¶ 315. Although

In New York, a cause of action for a constructive trust has four elements: (1) a fiduciary or confidential relationship; (2) a promise; (3) reliance on that promise; and (4) unjust enrichment. See, e.g., Maynor v. Pellegrino, 226 A.D.2d 883, 884, 641 N.Y.S.2d 155, 157 (3d Dep't 1996) (citing Gottlieb v. Gottlieb, 166 A.D.2d 413, 560 N.Y.S.2d 477 (2d Dep't 1990)). Although California courts do not impose precisely the same requirements to state a claim for a constructive trust,[36] a California plaintiff is "not entitled to relief under a constructive trust theory" if he "did not allege facts showing any fraud or breach of any fiduciary duty." Michaelian v. State Comp. Ins. Fund, 50 Cal. App. 4th 1093, 1114, 58 Cal. Rptr. 2d

---

none of the agreements appear to impose this requirement, we believe that the law to which the Model Plaintiffs refer is a section of the California Code that applies to contracts in the Arts, Entertainment, and Professional Sports. Section 6752 of the Code, which applies to contracts between minor entertainers and their employers, states in relevant part that a "minor's employer shall deposit or disburse the 15 percent of the minor's gross earnings pursuant to the contract within 15 business days after receiving a true and accurate copy of the trustee's statement pursuant to subdivision (c) of Section 6753 . . . ." Cal. Fam. Code § 6752(b)(4) (West 2004). Here, however, the complaint does not allege that any of the requirements set forth in the Code have been adhered to, particularly a court order approving the contract and the creation of the trustee's statement described in subpart (c) of Section 6753. Assuming that this is the law to which the complaint refers, it is inapplicable in light of the absence of any allegations that the Model Plaintiffs and their guardians complied with its requirements.

[36] In fact, California courts explicitly recognize that "[a] constructive trust is not a substantive device but merely a remedy . . . . ." Embarcadero Mun. Improvement Dist. v. County of Santa Barbara, 88 Cal. App. 4th 781, 793, 107 Cal. Rptr. 2d 6, 15 (Cal. Ct. App. 2001).

133, 147 (Cal. Ct. App. 1996). Thus, under both New York and California law, a plaintiff seeking a constructive trust must plead a fiduciary duty (or, in New York, a "confidential relationship") between plaintiff and defendant. As with their accounting claim, the Model Plaintiffs fail to make any such allegation, requiring dismissal of the tenth cause of action.[37]

## IV. Miller's Claims

Plaintiff Miller brings three causes of action against the L.A. Models Defendants: (1) breach of contract; (2) fraud and/or intentional misrepresentation; and (3) tortious interference prospective with business relations. For three reasons, the L.A. Models Defendants argue that all of Miller's claims require dismissal: first, Miller lacks standing to sue, as she was not a party to any agreements signed with the L.A. Models Defendants; second, her claims should have been brought as compulsory counterclaims pursuant to Fed. R. Civ. P. 13 in the earlier litigation before Judge Holwell; and third, that because her claims relate to the 2002 Contest and the other plaintiffs' claims all relate to the 2001 Contest, her claims should be severed pursuant to Fed. R. Civ. P. 21. Because we agree that

---

[37]    We note that not only did the complaint fail to make any allegation of a fiduciary relationship, but plaintiffs' counsel also did not provide any briefing on the eighth, ninth, and tenth causes of action.

Miller's claims were compulsory counterclaims in the earlier action, we dismiss them as barred by Rule 13.[38]

The case before Judge Holwell arose out of Stam's decision to disaffirm her contract with N.Y. Models after expressing her frustration with its representation of her. N.Y. Models, L.A. Models, and Holba alleged that Miller tortiously interfered with the existing contract between Stam and N.Y Models, as well as with any prospective business relationships the plaintiffs believed they could enter on Stam's behalf. In dismissing these claims, Judge Holwell concluded both that Stam, as a minor, had an absolute right to disaffirm her contract and that Miller had not engaged in fraud or misrepresentation in order to induce the disaffirmance. Judge Holwell also rejected the plaintiffs' breach of contract claim, finding that Miller had not violated the terms of the Mother Agency Agreement she had signed with N.Y. Models, as Stam's disaffirmance of the underlying agreement rendered the Mother Agency Agreement void. Finally, Judge Holwell granted Miller's motion for summary judgment on the plaintiffs' claims for defamation, unfair competition and

---

[38]    Although we do not decide the standing argument, Miller's tortious interference claim seems on its face sufficient to grant her standing to sue the L.A. Models Defendants, despite the fact that she was not a signatory to any of the contracts forming the basis for her claims. However, we note that Miller's vague and conclusory allegations of tortious interference may be insufficient to satisfy even a notice pleading standard.

misrepresentation,[39] concluding that the plaintiffs had failed to submit any admissible evidence in support of these claims. The complaint was thus dismissed in its entirety.

Rule 13(a) provides in relevant part:

> A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

Fed. R. Civ. P. 13(a). In determining whether Miller's claims should have been brought as compulsory counterclaims in the earlier action, we must determine whether "there is a logical relationship between the counterclaim and the main claim." Jones v. Ford Motor Credit Co., 358 F.3d 205, 209 (2d Cir. 2004) (internal citation and quotations omitted). This "logical relationship" test "does not require an absolute identity of factual backgrounds," but rather inquires into whether "the essential facts of the claims [are] so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit. Id. (internal citations and quotations omitted).

There is no question that Miller's claim for breach of

---

[39] Judge Holwell noted that the cause of action styled a "misrepresentation" claim actually alleged the elements of fraud. See NYC Mgmt. Group, Inc., 03 Civ. 2617(RJH), 2004 WL 1087784 at *9.

contract was a compulsory counterclaim in the earlier action, and is thus forfeited. See Jones, 358 F.3d at 209 ("[s]uch counterclaims are compulsory in the sense that if they are not raised, they are forfeited") (citation omitted). Miller was sued for breaching the MAA in the case before Judge Holwell, such that the claim she brings now for breach of that very same agreement literally involves "the same transaction." We thus dismiss Miller's breach of contract claim.

Miller's claim for fraud and/or intentional misrepresentation is similarly so logically related to the claims already litigated that she has forfeited the right to bring it. The thrust of her claim is that the defendants fraudulently induced Miller to enter into the MAA by knowingly misrepresenting the extent of the services they intended to offer Stam. Regardless of Miller's contention that she was not aware of these alleged misrepresentations until she had already filed a responsive pleading in the case before Judge Holwell, this cause of action clearly had already matured at the time that case was initiated. In fact, the complaint in the instant matter alleges repeatedly that as early as October 2002, Stam expressed to Miller her unhappiness with the L.A. Models Defendants for not fulfilling their promises to her. Thus, when Miller was sued in April 2003, she was already aware that the L.A. Models Defendants may have breached their obligations to

Stam, belying her allegation that she did not realize at that time that, "the LA Models Defendants did not possess the expertise, contacts and resources they had represented they had." Pl. Memo. of Law at 35. We thus dismiss Miller's fraud/intentional misrepresentation cause of action as barred by Rule 13.

We also dismiss Miller's claim for tortious interference with prospective business relations, which is based on Miller's belief that the L.A. Models Defendants attempted to thwart the advancement of Stam's career after she disaffirmed her modeling contract with them by, _inter_ _alia_, "fraudulently inducing Stam to enter into the 2002 Contest . . . , [and] filing baseless actions against both Miller and Stam . . . ." Compl. ¶ 341. These allegations also are so logically related to the underlying causes of action in the earlier case that Miller's failure to raise them before Judge Holwell renders them forfeited under Rule 13. Miller may not claim that she was unaware that the earlier action was baseless until after her answer, in light of her allegations, both then and now, that she believed it to be without merit at the time of its filing. Simply put, every fact underlying Miller's tortious interference claim was known to her (or was sufficiently obvious so as to put her on inquiry notice) at the time the earlier action was filed. In dismissing Miller's tortious interference claim, we emphasize

that the test for determining whether a claim is a compulsory counterclaim "does not require precise identity of issues between claim and counterclaim," but rather that "the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." Harris v. Steinem, 571 F.2d 119, 123 (2d Cir. 1978). Here, nearly all of the essential facts underlying Miller's claims were before Judge Holwell, such that the policy considerations underlying Rule 13 require that we dismiss her claims.

Finally, Miller's cause of action seeking an accounting is also forfeited under Rule 13. This claim, which arises under state law, accrues at the time the duty to pay arises. See, e.g., Glynwill Investments, N.V. v. Prudential Sec., Inc., 92 Civ. 9267(CSH), 1995 WL 362500 at *3 (S.D.N.Y. June 16, 1995) ("The claim[] for an accounting . . . accrued at the time each wrongful transaction occurred.") (citations omitted). Consequently, Miller's accounting claim accrued, at the latest, in February 2003, when Stam disaffirmed her contract. Because Miller was not sued until April 15, 2003, by which time her accounting claim had already accrued, she has similarly forfeited this claim under Rule 13.

## CONCLUSION

For the reasons above, the defendants' motion to dismiss the claims of Nic Bezuszka, Gilbert Kuncl, Jessica Kuncl, Troi Suliman, and Ashley Suliman is granted in part and denied in part. The defendants' motion to dismiss the claims of Michele Miller as barred by Rule 13 is granted. The parties are directed to appear for a conference on April 27, 2006 at 2:30 PM.

**SO ORDERED.**

Dated:    New York, New York
          March 24, 2006

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

Counsel for Plaintiffs
Anthony A. LoPresti, Esq.
Meltzer & LoPresti, LLP
545 Fifth Avenue, Suite 1205
New York, NY 10017

Counsel for Defendant NYC Management
Robert J. Hantman, Esq.
Hantman & Associates
432 Park Avenue South, 2nd Floor
New York, NY 10016

Counsel for Defendants L.A. Models and Heinz Holba
Howard K. Alperin, Esq.
Ropers, Majeski, Kohn & Bentley
515 South Flower Street, Suite 1100
Los Angeles, CA 90071

Counsel for Defendant Henkel Corporation
Jennifer A. Klear, Esq.
Drinker Biddle & Reath LLP
30 Broad Street, 30th Floor
New York, NY 10004